IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
_____

**UNITED STATES OF AMERICA,**

  **Plaintiff,**

**v.**                  **No. CR 01-1434 BB**

**JAIRO HERNANDEZ and
ENRIQUE MALDONADO,**

  **Defendants.**

### MEMORANDUM OPINION

**THIS MATTER** is before the Court on the motions of Jairo Hernandez and Enrique Maldonado to suppress [#24, #25]. Having reviewed the briefs of counsel and held an evidentiary hearing on February 11, 2002, the Court finds the motions supported by the law and the evidence, and they will be GRANTED.

### I. *Facts*

As several facts are in dispute, the relevant facts recited here contain the Court's findings.

Bernalillo County Sheriff's Deputy Peter Roth saw Defendants at a service station in a rural area off Interstate 40 on October 7, 2001. When Defendants left the station, Deputy Roth followed their blue Chevrolet Malibu. Deputy Roth

saw the Malibu roll through a stop sign approaching the entrance ramp of the freeway and engaged its police lights, and Mr. Hernandez, who was driving, pulled over.  During the walk between his police unit and the Malibu, Deputy Roth saw the passenger, Mr. Maldonado, reach under the seat and drew his sidearm from the holster.  When he reached the passenger's side, he was holding his revolver by his side.  Deputy Roth directed the passenger to keep his hands where he could see them and told him, "Don't move.  Why are you moving?  Put your hands on the dash, put your hands here, don't move."  Hernandez thought Deputy Roth might shoot and Maldonado's hands were visibly shaking.  After enforcing compliance with his command, Deputy Roth holstered his weapon.  Deputy Roth asked Hernandez for his license and registration.  Mr. Hernandez produced his license, which appeared to be a valid Florida driver's license.  The glove compartment was locked, so Defendants broke it open but could not produce the registration.

Deputy Roth then had Defendants step out of the car and attempted to question them.  Deputy Roth is not fluent in Spanish and had difficulty understanding Defendants who did not speak English.  Deputy Roth understood Hernandez to say the vehicle belonged to either a friend or a cousin, and that Defendants were traveling from California to Florida.  He could barely

understand Maldonado, who has a slight speech impediment, but understood him to say Defendants were going to Texas.

As Deputy Roth was getting ready to write Hernandez a warning citation, New Mexico State Police Officer Toby Olguin arrived at the scene. After being informed on the situation, Officer Olguin, who is a Spanish speaker, began to interrogate the Defendants. Officer Olguin determined Defendants had different stories regarding their travel, and asked Hernandez if there were any drugs in the car. Defendant Hernandez denied drugs and Officer Olguin offered to bet him there were drugs. (Tr. 99-100, 127)

Deputy Roth then gave Hernandez a warning ticket but retained his driver's license. Deputy Roth testified at that time Hernandez was "semi-free" to leave.[1] Rather than run the vehicle identification number ("VIN") or take some other step to determine ownership,[2] however, Deputy Roth asked Hernandez for consent to search the vehicle. Hernandez orally gave consent and signed a written consent to search form. Since he had previously looked in the car's interior, Deputy Roth proceeded to open the trunk with the keys he removed from the

---

[1] Deputy Roth testified, "I want to say he was free to leave, but I still had some issues with the registration and what was going on with the car." (Tr. 46)

[2] Deputy Roth testified his request to search was unrelated to concerns about vehicle ownership but was related to drugs or other criminal activity. (Tr. 53).

3

ignition. Deputy Roth pulled a cooler out of the trunk and even though it was full of food and ice, it seemed "too heavy." Deputy Roth then broke the outer plastic layer off and found approximately fourteen pounds of methamphetamine.

## II. *Standing*

The Government initially argues that since Defendants produced no title or registration, and a later VIN check indicated neither owned the car, Defendants lack standing to challenge the search. The Court would initially note that the Government's argument is internally inconsistent since its fall-back argument relies on consent. If Defendants lack sufficient indicia of ownership to challenge the search, it would seem logical they also lack the indicia of ownership to provide legal consent to a search. Moreover, the focus of the motions is the cooler, not the vehicle, and Hernandez admitted to owning the luggage in the vehicle. (Tr. 132) In this factual context, Hernandez has standing to challenge the search. *United States v. Perea*, 986 F.2d 633 (2d Cir. 1993); *United States v. Salazar*, 805 F.2d 1394 (9th Cir. 1986).

### III. Consent

#### A. Voluntariness

The Court finds the initial stop and questioning regarding travel plans complied with the Fourth Amendment.

While Deputy Roth was somewhat ambivalent about when he returned the driver's license to Hernandez, the Court finds consent was given while the Deputy retained the license. Officer Olguin questioned Hernandez as to whether the vehicle contained drugs and then Deputy Roth gave him a warning ticket and requested consent to search the vehicle. Hernandez testified he consented because Deputy Roth had already searched the car anyway.[3] Defendant Hernandez was not free to go and the officers were clearly focused on the need to look for drugs rather than investigating the ownership issue, which was their stated reason to further detain the Defendants. Once the tasks causing the stop "are completed, the driver must be allowed to proceed on his way without further detention for questioning unrelated to the purpose of the stop, unless the officer has a reasonable articulable suspicion that the driver is engaged in criminal activity or

---

[3] While Deputy Roth's testimony that he did not search the cabin but went right to the trunk might support that scenario, based on the Court's analysis it is largely irrelevant.

the driver consents to further questioning." *United States v. Caro*, 248 F.3d 1240, 1244 (10th Cir. 2001); *see also United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995). "[I]f the officer retains the driver's license, he or she must have reasonable and articulable suspicion to question the driver about guns or weapons." *United States v. Holt*, 229 F.3d 931, 936-7 (10th Cir. 2000), quoting *United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991). At the time Hernandez was questioned about drugs and then gave consent, Deputy Roth held Hernandez's license and could not articulate any suspicion that would support a vehicle search.

### B. <u>Scope of Consent</u>

Even if Deputy Roth had a basis to seek consent for a vehicle search while holding Defendants, he did not receive explicit consent to destroy the cooler by breaking off its outer cover. In *United States v. Osage*, 235 F.3d 518 (10th Cir. 2000), the Tenth Circuit dealt with analogous facts. In that case, Task Force Officer Salazar identified himself to the defendant and asked about his baggage. Defendant identified his baggage and gave consent to search it. The bag contained four cans of tamales which the officers opened with a Leatherman tool. In holding the general consent to search the luggage did not extend to breaking open the tamale cans, Judge Anderson said:

> We acknowledge that the Supreme Court and this court have previously stated that a general consent to search a particular area is reasonably understood to extend to a search of containers within that area that could contain contraband, absent some indication by the suspect that he wishes to terminate or limit the search. *See Jimeno*, 500 U.S. at 252 ("[I]f [a suspect's] consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization."); *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir.) ("We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent."), *cert. denied*, 528 U.S. 886 (1999). However, we do not read that authority to permit the destruction of such containers. [FN2] We therefore hold that, before an officer may actually destroy or render completely useless a container which would otherwise be within the scope of a permissive search, the officer must obtain explicit authorization, or have some other, lawful, basis upon which to proceed.

*Osage*, 235 F.3d at 521.

In the present case, Deputy Roth ripped off the plastic front of the cooler, thus destroying it and rendering it largely useless for its intended purpose. While his testimony indicates he performed the destruction incrementally, the Court finds he lacked consent to begin to separate the layers initially. The Court thus finds under *Osage* the search exceeded the scope of the consent provided.

7

**An order suppressing the packages found inside the lining of the cooler will issue.**

**Dated at Albuquerque this 21st day of February, 2002.**

**BRUCE D. BLACK
United States District Judge**

**Counsel for Plaintiff:**

   Erlinda V. Ocampo, AUSA, Albuquerque, NM

**Counsel for Defendant:**

   Richard A. Winterbottom, AFPD, Albuquerque, NM
   Dorothy C. Sanchez, Albuquerque, NM